## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| **EDWARD L. CAMP,** | ) | **CASE NO. 4:07CV3200** |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **MEMORANDUM** |
| | ) | **AND ORDER** |
| **MICHAEL J. ASTRUE,** | ) | |
| **Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

This matter comes before the Court on the denial, initially and on reconsideration, of the Plaintiff's disability insurance ("disability") benefits under the Social Security Act ("Act"), 42 U.S.C. § 401, *et seq.*, and supplemental security income ("SSI") benefits under Title XVI of the Act, 42 U.S.C. § 1381, *et seq.* The Court has carefully considered the record (Filing No. 12) and the parties' briefs (Filing Nos. 14, 20).

### PROCEDURAL BACKGROUND

The Plaintiff, Edward L. Camp, filed his initial application for Disability and SSI benefits on March 26, 2004.[1] (Tr. 87-89.) The claims were denied initially and on reconsideration. (Tr. 59-61, 64.) An administrative hearing was held before Administrative Law Judge ("ALJ") Jan E. Dutton on September 13, 2006. (Tr. 420-49.) On December 15, 2006, the ALJ issued a decision finding that Camp was not "disabled" within the meaning of the Act and therefore is not eligible for disability or SSI benefits. (Tr. 26.) On June 29, 2007, after considering additional evidence, the Appeals Council denied Camp's request for review. (Tr. 6-12.) Camp now seeks judicial review of the ALJ's determination as the

---

[1]Camp had also filed earlier applications (Tr. 76-78, 79-81) that were denied (Tr. 48-58).

final decision of the Defendant, the Commissioner of the Social Security Administration ("SSA").  (Filing No. 1.)

Camp argues that the ALJ's decision was incorrect as follows: 1) the ALJ's decision is not supported by substantial evidence; 2) the ALJ failed to give controlling weight to treating physicians' opinions; 3) the ALJ failed to discuss or consider the type, dosage, effectiveness, and side effects of medications; 4) the ALJ failed to comply with SSR 96-7p in determining that Camp did not comply with his medical treatment; 5) the ALJ's findings and conclusions regarding Camp's alcohol abuse are not supported by substantial evidence; 6) the vocational expert's opinion supports a finding of disability; and 7) new evidence presented after the hearing requires a reversal of the ALJ's decision.

Upon careful review of the record, the parties' briefs and the law, the Court concludes that the ALJ's decision denying benefits is supported by substantial evidence on the record as a whole.  Therefore, the Court affirms the Commissioner's decision.

## FACTUAL BACKGROUND

Camp is now forty-nine years old.  (Tr. 234.)  He has a high school education.  (Tr. 427.)  Camp most recently worked as a factory worker, and he has not engaged in substantial gainful employment since December 3, 2001.  (Tr. 98, 99.)

**Camp's Testimony**

At the hearing, Camp testified that he was 47 years old, divorced, and a high school graduate.  (Tr. 427.)  He has a son who was 20 years old at the time of the hearing.  Since his divorce in 1987, Camp has lived independently in a house.  He has not driven since his license was suspended in 2005.  He does his own household chores, but he needs to rest

2

often.  (Tr. 428.)  Camp's son usually mows his lawn for him.  (Tr. 428-29.)  Camp prepares his own meals.  (Tr. 429.)

Camp testified that for eleven years he had a steady job inspecting rail cars for grain.  He said that he lost the job due to cutbacks, yet he admitted that alcohol might have "partially" been involved in the loss of that job.  Since then Camp worked at temporary jobs. (Tr. 429.)  For a year he worked for ISCO cutting plastic parts.  Camp lost that job because he missed too much work.  He worked for Johnson Gear for an unspecified number of months; he did not indicate the type of job.  (Tr. 430.)  He also worked at Bison cutting steel parts for two months.  He quit that job because it was too "hard."  (Tr. 430-31.)  He also worked for Outlook Window Partnership, a custom window manufacturer, for approximately one year running table saws, sanders, routers and hand tools.  That job ended when the company went out of business. (Tr. 431.)  In 2004, Camp worked for a printing company through a temporary service, where he packaged items for mailing.  He said that he had difficulty standing at this job.  (Tr. 438.)

Camp testified that he applied for disability because he cannot work.  (Tr. 431-32.) He received unemployment benefits in 2001.  Camp testified that he could not handle the demands of standing, lifting, and constant movement required for the jobs he held within the five years prior to the hearing.  (Tr. 432.)  Camp testified that after sitting for one hour he needs to lie down due to fatigue.  (Tr. 439.)  He said that he can stand in one spot for about fifteen minutes.  (Tr. 439.)   He "guessed" that light duty jobs or jobs at which he could sit were hard to find.  (Tr. 432.)  Camp added that he might not take a sedentary job because he gets tired from just sitting.  (Tr. 433.)  Camp went to vocational rehabilitation

3

and tried to learn to use a computer, but he found that difficult.  (Tr. 432.)  At the time of the hearing, Camp was not looking for a job.  (Tr. 434.)

Camp testified that he had not had alcohol for ten months because he was on probation, had been through treatment, and wanted to stop drinking.  He said that his diabetes remained "off the charts."  He stated that he noticed no ill effects on his diabetes from drinking alcohol.  Camp had five convictions for driving under the influence ("DUI").  (Tr. 433.)  Camp testified that he was not seeing an endicronologist for his diabetes because he could not afford to see a specialist.  He continued to see John P. Majerus, M.D., because his mother was helping him pay for that care.  (Tr. 434.)  His mother helps him pay for his testing strips.  (Tr. 438.)  Camp said he had been suffering symptoms from both high and low blood sugars daily for six years.  (Tr. 435.)  Camp testified that when his blood sugar is high, which he defines as over 200, his symptoms are extreme fatigue and blurry vision.  (Tr. 434, 535.)  When his blood sugar is low, which he defines as under 70, he experiences body sweats and, when he takes glucose tablets to overcome the low blood sugar, he gets very cold.  (Tr. 434, 436.)   It takes Camp between two hours and a day to recover from a low blood sugar episode.  (Tr. 436.)  He testified that he becomes concerned and takes blood glucose tablets or calls 911 when his low blood sugars are below 50.  (Tr. 436-37.)  Camp stated that he has called 911 four or five times[2] and gone to the emergency room once or twice.  Camp also testified that he experiences pain ranging from his hips to his ankles on a daily basis.  (Tr. 437.)

---

[2]Only one 911 call is documented in the record.  (Tr. 313.)

4

Camp testified that he has been depressed for some time.  He said that he has not sought treatment for depression because he cannot afford it.  (Tr. 438.)

Camp testified that he gets to sleep at about 10:30 p.m. and gets up at 6:00 a.m. During the night he gets up three or four times to use the bathroom, which he attributes to his diabetes.  He stated that he feels tired when he gets up.  (Tr. 440.)  During the day Camp often lies down without sleeping.  (Tr. 440-41.)  Camp's main activities are playing the guitar and going to AA meetings and his treatment center, After Care.  (Tr. 441.)  Camp meets twice monthly with his probation officer and undergoes random drug and alcohol testing.  (Tr. 441-42.)  Camp has been in inpatient alcohol treatment once and he "tried" outpatient treatment five or six years ago.  The ten and one-half month period prior to the hearing has been Camp's longest period of sobriety.  Camp's next lengthiest period of sobriety lasted between four and six months.  Camp smokes one and a half packs of cigarettes daily, costing him about $10.00 per week.  His mother gives him his cigarette money.  (Tr. 442.)

***Vocational Expert's Testimony***

Testimony was also heard from a vocational expert ("VE"), Steven Kuhn.[3]  For the first hypothetical, the VE assumed that Camp can: lift or carry twenty-five pounds frequently and fifty pounds occasionally; stand, sit or walk six out of eight hours; avoid operating heavy or dangerous equipment and hazards such as ladders, ropes, or scaffolds; avoid driving a car; and work with others.  In this scenario, the VE opined that Camp could

---

[3]Mr. Kuhn's curriculum vitae is in the record.  (Tr. 74.)

5

perform his past relevant work as a grain picker.   The job exists in significant numbers in the local and national economies.  (Tr. 444-46.)

The VE also assumed for a second hypothetical that Camp can: lift ten pounds frequently and twenty pounds occasionally; stand, sit, or walk six hours out of an eight-hour day; avoid dangerous or heavy equipment and not drive a car.  With these parameters, the VE opined that Camp could still work as a grain picker and also work as a fast food worker, housekeeper, assembler, and general office clerk.  (Tr. 446-47.)  Those jobs exist in significant numbers locally and nationally.  (Tr. 447-48.)

***Documentary Evidence Before the ALJ***

Camp alleges that he is disabled as of December 4, 2001, due to diabetes.  (Tr. 98.)  He reported that his diabetes left him unable to stand for long periods of time or lift as much weight as he could previously.  (Tr. 98.)

Medical records dating from 2000 to 2001, before Camp's alleged onset date, show that Camp was briefly under the care of Brenda K. Bell, M.D.  (Tr. 280-83.)  Dr. Bell's records reflect that "[l]ow sugar reactions were occurring a couple of times per week in the setting of excessive alcohol use at night."  (Tr. 280.)  Camp had "no interest" in counseling or inpatient treatment for his diagnosed alcohol abuse, despite being aware that his alcohol use could cause hypoglycemic reactions and seizures.  (Tr. 280.) Camp became angry when an educator confronted him about his alcohol abuse.  Dr. Bell stated that Camp's claim that insurance did not cover his diabetic supplies was "very unusual."  She gave him some supplies.  (Tr. 283.)

Also prior to the relevant period, on September 12, 2000, Camp was seen for a psychological and substance abuse evaluation at the University of Nebraska at Lincoln,

6

conducted by John Clemmons, M.S., and Heidi Inderbitzen-Nolan, Ph.D. (Tr. 329.) Camp was referred for the evaluation after a DUI arrest, his fifth such offense since 1989. (Tr. 329.) Camp admitted to a pattern of alcohol use and first using alcohol at age 15. (Tr. 329-30.) He stated that his last use was in February of 2000, when he was placed in detoxification. (Tr. 329.) He also admitted to past use of marijuana, mushrooms, cocaine, crystal methamphetamine, and "downers." (Tr. 330.) Camp admitted that his alcohol use caused him legal problems, lost jobs, relationship difficulties, car accidents, revocation of his driver's license, physical symptoms, blackouts, and depression. (Tr. 330.) The evaluator diagnosed the following: alcohol dependence with physiological dependence; cocaine dependence without physiological dependence, sustained full remission; cannabis abuse; depressive disorder; type II diabetes mellitus; and occupational problems. Camp's GAF was rated as 55. (Tr. 333.)

In March of 2000, Camp saw Paul Gobbo, M.D. Dr. Gobbo noted Camp's attempted compliance with his medications and his noncompliance with his diet restrictions and blood glucose testing. (Tr. 292, 293.) Dr. Gobbo also examined Camp in April of 2002, during the relevant period. Dr. Gobbo's notes reflect that Camp had lost his job, could not find a new job, smoked two packs of cigarettes a day, and was still drinking alcohol. Camp appeared tired and depressed, yet he was alert, oriented, and in no acute distress. (Tr. 287.) Dr. Gobbo's impressions were: bilateral lower extremity pain, perhaps multi-factorial and with an element of peripheral arterial disease; type II diabetes mellitus; chronic alcoholism; and chronic tobacco use. (Tr. 288.) Dr. Gobbo ordered an EKG, chest X-rays, and a Doppler test, all of which were negative. (Tr. 288-89.) Dr. Gobbo's notes from Camp's October 24, 2000, visit state that Camp was getting along well despite losing

7

his job and a legal problem.  (Tr. 291.)  In December of 2002, Dr. Gobbo completed a vocational rehabilitation form, stating that the restrictions and limitations impairing Camp's ability to work were "mood disorder (depression) and alcohol abuse."  (Tr. 305.)

In December of 2002, Camp began seeing Jalal Nafach, M.D., an endicronologist. Camp told Dr. Nafach that despite suffering from hypoglycemia he had not been checking his blood sugars or following any diet.  Camp denied using alcohol.  He was not exercising. (Tr. 316.)  On examination Camp was comfortable and not in distress.  Dr. Nafach's primary diagnosis was poorly controlled diabetes.  Dr. Nafach gave Camp a blood glucose meter and test strips.  Camp was to test his blood sugar before meals and at bedtime and return in one week.  (Tr. 317.)  Camp returned two weeks later, and his blood sugars showed that he was waking at night with hypoglycemia.  Camp was then placed on insulin therapy.  (Tr. 314-15.)  Dr. Nafach's January 7, 2003, report referred to a severe hypoglycemic episode requiring an emergency medical team.  (Tr. 313.)  On January 31, 2003, Dr. Nafach noted that Camp was taking carbohydrate counting class.  Camp was told to track his carbohydrate intake and return with those numbers in three or four weeks. (Tr. 311-12.)  In January of 2003, Dr. Nafach completed a form for vocational services regarding Camp's work limitations, writing that, until Camp "gets diabetes under control, he should be only working with people around him and not using heavy equipment and not driving [a] car."  (Tr. 306.)  Despite Dr. Nafach's suggested continued treatment and a written warning of a missed followup appointment, Camp did not return to see Dr. Nafach until September 13, 2004.  (Tr. 308, 310.)  Dr. Nafach noted that Camp's diabetes remained poorly controlled, and he also diagnosed Camp with depression.  Camp was advised to return in two or three months.  (Tr. 308.)

8

Scott McPherson, M.D., saw Camp twice, on September 23, 2003 (Tr. 320-323), and June 22, 2004. (Tr. 324-28.) Camp told Dr. McPherson that he had not seen his endocrinologist for several months because he could not afford to do so. (Tr. 320.) Camp reported continued smoking and drinking two to three pints of vodka monthly, one pint at a time. (Tr. 321.) The examination was normal. (Tr. 322.) Dr. McPherson discussed Camp's alcohol abuse and its negative effect on the management and control of his diabetes. Dr. McPherson opined that Camp's risk of end-organ damage is significant because he was not managing his diabetes. (Tr. 323.)

On April 21, 2004, Camp was brought into the emergency room after he was found passed out in a restroom at a local establishment. (Tr. 336-37.) He had been drinking heavily and smelled strongly of alcohol. (Tr. 337-38.) His ethyl alcohol level was 344 mg/dL. (Tr. 342.) With an initial blood sugar level of 22, Camp was hypoglycemic. (Tr. 337.) Camp was released the same day. (Tr. 348.)

On June 22, 2004, Camp again saw Dr. McPherson. (Tr. 324.) He admitted to continued alcohol use. Camp said that he had not been receiving medical treatment because of his lack of insurance and funds. He complained of numbness in his feet and tingling in his lower extremities. Camp admitted to a history of binge drinking, adding that his longest period of sobriety was sixty days when he was in jail. (Tr. 324.) Dr. McPherson's examination also revealed a greater level of limitation than before. (Tr. 324-28.) Dr. McPherson noted that Camp might have had an undiagnosed cerebrovascular accident and stated that control of Camp's alcoholism and diabetes was essential to his future health. (Tr. 328.)

9

On July 8, 2005, Camp saw John P. Majerus, M.D.  Camp said he was drinking two pints of vodka three nights weekly and continued to smoke heavily.  He still had no insurance or money and was having problems paying for his medications.  He still had some glucose test strips at home.  He was diagnosed with: insulin dependent diabetes; tobacco abuse; hypertension; alcohol abuse; and depression.  He refused a hemoglobin A1C test because of the cost.  (Tr. 361.)  During his next visit in February of 2006, Dr. Majerus noted that Camp had been noncompliant with his diabetes treatment, was still smoking, and reportedly stopped drinking after inpatient treatment in October of 2005. Camp had been sentenced to jail time for his third DUI.  His hemoglobin A1C test taken the previous week measured 10.4.  Dr. Majerus gave him some insulin samples.  (Tr. 360.) Dr. Majerus noted that after Camp's release from jail in August of 2006, Camp was having some leg pain and dyskinesia-type movements likely related to his alcohol abuse. Camp also complained of chest pain.  He refused a treadmill cardiolite examination.  His blood sugars had been running very high.  Dr. Majerus recommended lab work for Camp's diabetes, a treadmill cardiolite examination, and a possible neurology evaluation. (Tr. 359.) Camp refused any testing due to his lack of insurance.  Dr. Majerus gave Camp more insulin samples.  (Tr. 359.)

On September 26, 2006, Dr. Majerus wrote a letter for Camp's attorney in which he stated that Camp had pain and fatigue due to his "brittle," or uncontrolled, diabetes as shown by his high hemoglobin A1C test result.  (Tr. 373.)  Dr. Majerus believed Camp was having some fuzzy vision and episodes of hypoglycemia, which caused sweating, shakes, and fatigue.  (Tr. 34.)  He concluded that Camp's problems caused "inability to engage in

10

substantial gainful activity and certainly would have adverse effects on him engaging in a full-time competitive labor at a sedentary level." (Tr. 374.)

After the ALJ issued her decision on May 17, 2007, Camp's attorney sent him for a consultative examination with Kathryn M. Hajj, M.D. (Tr. 375.) Camp told Dr. Hajj that he had not had any alcohol in more than a year yet his blood sugars still varied considerably. (Tr. 376.) Dr. Hajj opined that Camp's stable health status would not continue and he would certainly suffer complications due to his uncontrolled diabetes. She suggested that Camp try an insulin pump to control his blood sugars. She noted that Camp was currently in "stable health for now," but that he could expect a decline in the future. (Tr. 378.) Dr. Hajj believed that Camp was a safety risk to potential employers and coworkers because he could lose consciousness. She stated that he has been disabled since his alleged disability onset date. (Tr. 379.) Finally, Dr. Hajj opined that to a reasonable degree of medical certainty Camp could not perform any work, even at a sedentary level. (Tr. 380.)

## THE ALJ'S DECISION

The ALJ found that Camp was not "disabled" pursuant to his application for disability benefits under disability or SSI benefits. (Tr. 25.) The ALJ framed the issues as whether Camp is: (1) entitled to disability and SSI benefits under the Act; and (2) is disabled. (Tr. 17.)

The ALJ followed the five-step sequential evaluation process set out in 20 C.F.R. §§ 404.1520 and 416.920 (2001)[4] to determine whether Camp was disabled, considering

---

[4]Section 404.1520 relates to disability benefits, and identical § 416.920 relates to SSI benefits. For simplicity, further references will only be to § 404.1520.

11

any current substantial gainful work activity, the severity of any medically determinable impairments, and Camp's residual functional capacity with regard to his ability to perform past relevant work or other work that exists in the national economy.  (Tr. 18-25.)  Specifically, at step one the ALJ found that Camp has not performed any substantial gainful work activity since December 3, 2001.  (Tr. 24.)  At step two, the ALJ found that Camp suffers from insulin-dependent diabetes mellitus with early peripheral neuropathy, early hypertension, mild depression, and a history of substance abuse with a claimed remission of ten months.  (Tr. 24.)  At step three, the ALJ found that Camp's medically determinable impairments, either singly or collectively, do not meet section 12.04 or any other section of Appendix 1 to Subpart P of the Social Security Administration's Regulations No. 4, known as the "listings." (Tr. 19, 24.)  At step four, the ALJ determined that, despite Camp's medically determinable impairments, he possessed the residual functional capacity to perform his past relevant work as a grain picker.  (Tr. 24.)

Finally, at step five the ALJ found that Camp has the residual functional capacity to perform the following light unskilled jobs that exist in significant numbers in the local and national economies: fast food restaurant worker; housekeeper; and assembler.  The ALJ also found that Camp can perform the following sedentary jobs existing in significant numbers in the local and national economies: assembler;  general office clerk; and order clerk.  (Tr. 25.)  In so deciding, the ALJ weighed Camp's testimony, finding the testimony not credible with respect to Camp's allegation of impairments, singly or in combination, allegedly producing symptoms and limitations of sufficient severity that prevent him from doing any sustained work activity.  (Tr. 24.)  The ALJ also carefully considered the medical records submitted by treating physicians Drs. Gobbo, Nagach, and Majerus.  (Tr. 19-21.)

12

## STANDARD OF REVIEW

In reviewing a decision to deny disability benefits, a district court does not reweigh evidence or the credibility of witnesses or revisit issues *de novo*. *Bates v. Chater*, 54 F.3d 529, 532 (8th Cir. 1995); *Harris v. Shalala,* 45 F.3d 1190, 1193 (8th Cir. 1995).  Rather, the district court's role under 42 U.S.C. § 405(g) is limited to determining whether substantial evidence in the record as a whole supports the Commissioner's decision and, if so, to affirming that decision.  *Harris,* 45 F.3d at 1193.

"Substantial evidence is less than a preponderance, but enough that a reasonable mind might accept it as adequate to support a decision."  *Holmstrom v. Massanari,* 270 F.3d 715, 720 (8th Cir. 2001). The Court must consider evidence that both detracts from, as well as supports, the Commissioner's decision.  *Id.*  As long as substantial evidence supports the Commissioner's decision, that decision may not be reversed merely because substantial evidence would also support a different conclusion or because a district court would decide the case differently.  *McKinney v. Apfel,* 228 F.3d 860, 863 (8th Cir. 2000); *Harris,* 45 F.3d at 1193.

## DISCUSSION

### "DISABILITY" DEFINED

An individual is considered to be disabled if he is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to . . . last for a continuous period of not less than twelve months."  42 U.S.C. § 423(d)(1)(A).  The physical or mental impairment must be of such severity that the claimant is "not only unable to do his previous work but cannot,

considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."  42 U.S.C. § 423(d)(2)(A). If the claimant argues that he has multiple impairments, the Act requires the Commissioner to "consider the combined effect of all of the individual's impairments without regard to whether any such impairment, if considered separately, would be of such severity." 42 U.S.C. § 423(d)(2)(B).

SEQUENTIAL EVALUATION

In determining disability, the Act follows a sequential evaluation process.  *See* 20 C.F.R. § 416.920.  In engaging in the five-step process, the ALJ considers whether: 1) the claimant is gainfully employed; 2) the claimant has a severe impairment; 3) the impairment meets the criteria of the "listings"; 4) the impairment prevents the claimant from performing past relevant work; and 5) the impairment necessarily prevents the claimant from doing any other work.  *Id.*  If a claimant cannot meet the criteria at any step in the evaluation, the process ends and the determination is one of no disability.  *Id.*

In this case, the ALJ completed the five-step analysis, concluding that Camp is not disabled.  The issues raised by Camp in his appeal are whether: 1) the ALJ's decision is not supported by substantial evidence; 2) the ALJ failed to give controlling weight to treating physicians' opinions; 3) the ALJ failed to discuss or consider the type, dosage, effectiveness, and side effects of medications; 4) the ALJ failed to comply with SSR 96-7p in determining that Camp did not comply with his medical treatment; 5) the ALJ's findings and conclusions regarding Camp's alcohol abuse are not supported by substantial

14

evidence; 6) the vocational expert's opinion supports a finding of disability; and 7) new evidence presented after the hearing requires a reversal of the ALJ's decision.

**SUBSTANTIAL EVIDENCE ON THE RECORD AS A WHOLE**

**_Credibility of Camp's Testimony_**

The ALJ found that Camp's testimony was inconsistent with the medical evidence. The credibility of Camp's testimony in its entirety is crucial because, in determining the fourth and fifth factors relating to a claimant's residual functional capacity to perform past relevant work and a range of work activities in spite of his impairments, the ALJ must evaluate the credibility of a claimant's testimony regarding subjective pain complaints. The underlying issue is the severity of the pain. _Black v. Apfel,_ 143 F.3d 383, 386-87 (8th Cir. 1998). The ALJ is allowed to determine the "authenticity of a claimant's subjective pain complaints." _Ramirez v. Barnhart,_ 292 F.3d 576, 582 (8th Cir. 2002) (citing _Troupe v. Barnhart,_ 32 Fed. Appx. 783, 784 (8th Cir. 2002)); _Clark v. Shalala,_ 28 F.3d 828, 830-31 (8th Cir. 1994)). An "'ALJ may discount subjective complaints of pain if inconsistencies are apparent in the evidence as a whole.'" _Haley v. Massanari,_ 258 F.3d 742, 748 (8th Cir. 2001) (stating the issue as whether the record as a whole reflected inconsistencies that discredited the plaintiff's complaints of pain) (quoting _Gray v. Apfel,_ 192 F.3d 799, 803 (8th Cir.1999)).

Also, an ALJ may resolve conflicts among various treating and examining physicians, assigning weight to the opinions as appropriate. _Pearsall v. Massanari,_ 274 F.3d 1211, 1219 (8th Cir. 2001).

The _Polaski_ standard is the guide for credibility determinations:

15

While the claimant has the burden of proving that the disability results from a medically determinable physical or mental impairment, direct medical evidence of the cause and effect relationship between the impairment and the degree of claimant's subjective complaints need not be produced. The adjudicator may not disregard a claimant's subjective complaints solely because the objective medical evidence does not fully support them.

The absence of an objective medical basis which supports the degree of severity of subjective complaints alleged is just one factor to be considered in evaluating the credibility of the testimony and complaints. The adjudicator must give full consideration to all of the evidence presented relating to subjective complaints, including the claimant's prior work record, and observations by third parties and treating and examining physicians relating to such matters as:

1. the claimant's daily activities;
2. the duration, frequency and intensity of the pain;
3. precipitating and aggravating factors;
4. dosage, effectiveness and side effects of medication;
5. functional restrictions.

The adjudicator is not free to accept or reject the claimant's subjective complaints *solely* on the basis of personal observations. Subjective complaints may be discounted if there are inconsistencies in the evidence as a whole.

*Polaski v. Heckler,* 739 F.2d 1320, 1322 (8th Cir. 1986).

Interpreting the *Polaski* standard, §§ 404.1529 and 416.929 discuss the framework for determining the credibility of subjective complaints, e.g., pain.

An ALJ is required to make an "express credibility determination" when discrediting a social security claimant's subjective complaints.  *Lowe v. Apfel,* 226 F.3d 969, 971-72 (8th Cir. 2000).  This duty is fulfilled when an ALJ acknowledges the *Polaski* factors, and the ALJ has clearly examined the factors before discounting the claimant's testimony.  An ALJ is "not required to discuss methodically each *Polaski* consideration."  *Id.* at 972.

16

The federal regulations provide that the ALJ must consider all symptoms, "including pain, and the extent to which symptoms can reasonably be accepted as consistent with the objective medical evidence," defined as "medical signs and laboratory findings." 20 C.F.R. § 416.929.  Medical "signs" are defined as:

> anatomical, physiological, or psychological abnormalities which can be observed, apart from your statements (symptoms). Signs must be shown by medically acceptable clinical diagnostic techniques. Psychiatric signs are medically demonstrable phenomena that indicate specific psychological abnormalities, *e.g.*, abnormalities of behavior, mood, thought, memory, orientation, development, or perception. They must also be shown by observable facts that can be medically described and evaluated.

20 C.F.R. § 416.928(b).

> "Laboratory findings" are defined as: "anatomical, physiological, or psychological phenomena which can be shown by the use of medically acceptable laboratory diagnostic techniques. Some of these diagnostic techniques include chemical tests, electrophysiological studies (electrocardiogram, electroencephalogram, etc.), roentgenological studies (X-rays), and psychological tests."

20 C.F.R. § 416.928(c).

Social Security Ruling 96-7p provides that a "strong indication" of the credibility of a claimant's statements is the consistency of the claimant's various statements and the consistency between the statements and the other evidence in the record.  Ruling 96-7p provides that the ALJ must consider such factors as:

> * The degree to which the individual's statements are consistent with the medical signs and laboratory findings and other information provided by medical sources, including information about medical history and treatment.

> * The consistency of the individual's own statements. The adjudicator must compare statements made by the individual in connection with his or her claim for disability benefits with statements he or she made under other circumstances, when such information is in the case record. Especially important are statements made to treating or examining medical sources and to the "other sources" defined in 20 CFR 404.1513(e) and 416.913(e).

17

However, the lack of consistency between an individual's statements and other statements that he or she has made at other times does not necessarily mean that the individual's statements are not credible. Symptoms may vary in their intensity, persistence, and functional effects, or may worsen or improve with time, and this may explain why the individual does not always allege the same intensity, persistence, or functional effects of his or her symptoms. Therefore, the adjudicator will need to review the case record to determine whether there are any explanations for any variations in the individual's statements about symptoms and their effects.

\* The consistency of the individual's statements with other information in the case record, including reports and observations by other persons concerning the individual's daily activities, behavior, and efforts to work. This includes any observations recorded by SSA employees in interviews and observations recorded by the adjudicator in administrative proceedings.

SSR 96-7p, 1996 WL 374186 (S.S.A.) at \*5 (July 2, 1996). [5]

Deference is generally granted to an ALJ's determination regarding the credibility of a claimant's testimony and, in particular, subjective complaints of pain. *Dunahoo v. Apfel,* 241 F.3d 1033, 1038 (8th Cir. 2001) (stating that if an ALJ provides a "good reason" for discrediting claimant's credibility, deference is given to the ALJ's opinion, although every factor may not have been discussed).

In Camp's case, the record illustrates that the ALJ performed a thorough *Polaski* analysis in determining the credibility of Camp's subjective pain complaints.  In making the credibility determination, the ALJ considered that Camp has not performed substantial gainful activity since December 3, 2001, did some temporary work up until 2004, was jailed for his third DUI offense in 2006, and was placed on probation in April of 2006.  Camp admitted a history of substance abuse but as of 2006 was reporting to a probation officer

---

[5]Social Security Ruling 96-7p is entitled: "Policy Interpretation Ruling Titles II and XVI: Evaluation of Symptoms in Disability Claims: Assessing the Credibility of an Individual's Statements.

and attending AA meetings. He continued to smoke heavily. He often did not take suggested or prescribed medications and insulin because he did not have insurance and could not afford them on his own.[6] Camp worked steadily up until the date of his alleged onset of disability. He missed medical appointments. Prior disability applications filed in 2002 and 2003 were not pursued when they were denied. Camp's medical records often reflected his doctor's views that his uncontrolled diabetes was heavily related to his alcohol abuse and that this issue was discussed with and understood by Camp.

The ALJ thoroughly considered the medical opinions of Drs. Gobbo, Nagach, McPherson, and Majerus.

In summary, the ALJ thoroughly considered Camp's complaints, the reports of his treating and consultative physicians, efforts at medical treatment, and Camp's own statements.[7] The ALJ correctly engaged in the *Polaski* analysis. Although the ALJ did not

------

[6]Camp argues that the ALJ failed to consider the effectiveness of his medications and treatment, his inability to afford treatment, and the lack of a positive effect on his health when he maintained sobriety. The record is replete with evidence showing Camp's failure to obtain prescribed medications, comply with treatment for his diabetes, and undergo alcohol treatment as recommended. Camp argues that he did not follow his treatment and medication regimen because he could not afford to do so. However, the record shows many instances in which he was supplied with samples of medications, including insulin. The record also shows that Camp's mother helped him buy testing strips and pay for medical expenses. Also, the record contains no evidence showing that Camp made any effort to obtain indigent care. Therefore, such evidence is inconsistent with Camp's claim that he could not follow his prescribed treatment due to a lack of financial resources. *Brown v. Barnhart,* 390 F.3d 535, 540 (8th Cir. 2004); *Riggins v. Apfel,* 177 F.3d 689, 693 (8th Cir.1999). Failure to follow a treatment plan is not excused in every case in which a claimant has financial difficulties making it difficult to obtain treatment or medications. *Brown v. Heckler,* 767 F.2d 451, 453 n.2 (8th Cir. 1985).

[7]Camp's complaints that the ALJ failed to consider his allegations of depression are unfounded. The ALJ noted that the record does not document any limitation of Camp's activities by depression. Camp was never prescribed medications for

cite to *Polaski*, she cited to §§ 404.1529 and 416.929 and recited the applicable considerations.  (Tr. 19.)  The ALJ's conclusion that Camp's pain is not severe enough to prevent him from engaging in some of his past relevant work as performed was well-founded, and followed an appropriate express credibility determination regarding Camp's testimony and complaints.  The ALJ's credibility decision was well-supported and based on a thorough analysis.

Therefore, the ALJ appropriately determined that Camp's testimony was not credible with respect to the extent of his symptoms and limitations.

### Past Relevant Work

The ALJ bears the primary responsibility for assessing Camp's residual functional capacity based on the relevant evidence.  However, Camp's residual functional capacity is a medical question.  *Hutsell v. Massanari,* 259 F.3d 707, 711 (8th Cir. 2001).   The ALJ must resolve any conflict in the medical evidence.  *Id.*  However, some medical evidence "'must support the determination of the claimant's [residual functional capacity], and the ALJ should obtain medical evidence that addresses the claimant's ability to function in the workplace.'" Id. at 712 (quoting *Lauer v. Apfel,* 245 F.3d 700, 704 (8th Cir. 2001)).  "To properly determine a claimant's residual functional capacity, an ALJ is therefore 'required to consider at least some supporting evidence from a [medical] professional.'" *Id.* (quoting *Lauer,* 245 F.3d at 704).

In Camp's case, the ALJ followed the procedures in determining that Camp retained the residual functional capacity to return to some of his past relevant work.  The ALJ

---

depression or referred for mental health care.  At the hearing, the ALJ noted no obvious signs of depression.  (Tr. 22.)

considered, among other things, records from both treating and agency physicians. Conflicts existed among those opinions, and therefore the ALJ carefully examined the various opinions in light of when the physicians treated Camp in relation to his alleged onset date and the frequency with which they treated Camp. Camp argues that the ALJ considered only the information stated by Drs. Gobbo and Nafach in forms requesting information for vocational rehabilitation services. (Tr. 305, 306.) However, the record shows that the ALJ considered the entire history of Camp's treatment with Drs. Gobbo and Nafach. (Tr. 19, 21.) Taking all of this evidence as well as additional relevant evidence into consideration, the Court finds that the ALJ properly determined the fourth and fifth steps of the inquiry.

Therefore, this Court agrees that the ALJ properly determined that Camp could return to his past relevant work as a grain picker.

### Residual Functional Capacity

Residual functional capacity is defined as what Camp "can still do despite . . . limitations." 20 C.F.R. §§ 404.1545(a), 416.945(a). Residual functional capacity is an assessment based on all "relevant evidence," *id.*, including a claimant's description of limitations; observations by treating or examining physicians or psychologists, family, and friends; medical records; and the claimant's own description of his limitations. *Id.* §§ 404.1545(a)-(c), 416.945(a)-(c).

The ALJ must determine RFC based on all of the relevant evidence, including the medical records, observations of treating physicians and others, and the claimant's own description of his limitations. *McKinney,* 228 F.3d at 863-64. Before determining residual functional capacity, an ALJ first must evaluate the claimant's credibility. In evaluating

21

subjective complaints, the ALJ must consider, in addition to objective medical evidence, any other evidence relating to: a claimant's daily activities; duration, frequency and intensity of pain; dosage and effectiveness of medication; precipitating and aggravating factors; and functional restrictions. *See Polaski,* 739 F.2d at 1322; *see also* § 404.1529. Subjective complaints may be discounted if there are inconsistencies in the evidence as a whole. *Polaski,* 739 F.2d at 1322. A lack of work history may indicate a lack of motivation to work rather than a lack of ability. *See Woolf v. Shalala,* 3 F.3d 1210, 1214 (8th Cir.1993) (stating that a claimant's credibility is diminished by a poor work history). The credibility of a claimant's subjective testimony is primarily for the ALJ, not a reviewing court, to decide. *Pearsall,* 274 F.3d at 1218.

In this case, the ALJ set out the language describing the appropriate standard under *Polaski* and § 404.1529. (Tr. 22-23.) The ALJ summarized Camp's testimony, described his physical abilities, and summarized the documentary evidence. (Tr. 18-22.) The ALJ did not find Camp's testimony not credible. (Tr. 19.) The ALJ specifically considered, in addition to Camp's testimony, his work record, documentary evidence including reports of treating and consultative physicians, the lack of certain symptoms associated with complications relating to diabetes, Camp's substance abuse,[8] Camp's failure to follow up with vocational rehabilitation, and the testimony of the vocational expert. The ALJ did not discuss the type, dosage, effectiveness and side effects of any medications. However,

---

[8]Camp argues that he has maintained sobriety for a significant amount of time and that the absence of alcohol has not positively affected his blood sugar levels. Although Camp's recent sobriety is commendable, his physicians often noted the measurable negative effects of alcohol on Camp's blood sugars and the systemic effects of Camp's long-term alcohol abuse.

22

other than insulin the record is silent with respect to any other prescribed medications. One doctor specifically noted that glucophage, an oral medication that might have helped Camp's blood sugars, was not prescribed due to his alcohol use.  Camp did not testify that he was on any medications at the time of his hearing.  The record shows that he was on insulin, which Camp allegedly could not afford but which was given to him by his doctors. The absence of discussion of medications and side effects is of no consequence.

The ALJ concluded that Camp has the residual functional capacity to perform his past relevant work as a grain picker as well as light sedentary jobs such as a fast food worker, housekeeper and assembler, and also sedentary jobs such as an assembler, general office clerk, and order clerk.  (Tr.  25.)

### Questions Posed to Vocational Expert

A vocational expert's hypothetical questions are proper if they sufficiently set out all of the impairments accepted by the ALJ as true, and if the questions likewise exclude impairments that the ALJ has reasonably discredited.  *Pearsall,* 274 F.3d at 1220.

Examining the hypotheticals posed to the VE in this case, the questions properly included the impairments that the ALJ found to be substantially supported by the record as a whole.  Camp argues that the VE did not consider his testimony.  However, the VE properly did not consider Camp's testimony because it has been found not credible.  The issue is therefore moot.

### New Evidence

Camp argues that new evidence, a report of Dr. Kathryn Hajj, M.D., warrants reversal of the ALJ's decision.  Dr. Hajj's report was a result of Camp's attorney's referral.

23

The report is dated May 17, 2007, well after the relevant period, and consists largely of answers to questions posed by Camp's attorney.  (Tr. 375-80.)

A court may order the ALJ to consider additional evidence only upon a showing that the new evidence is material and that good cause exists for the party's failure to previously incorporate the evidence in the record.  *Hinchey v. Shalala,* 29 F.3d 428, 432 -33 (8th Cir. 1994).   "Material" evidence "must be non-cumulative, relevant, and probative of the claimant's condition for the time period for which the benefits were denied, and there must be a reasonable likelihood that it would have changed the Secretary's determination." *Woolf v. Shalala,* 3 F.3d 1210, 1215 (8th Cir.1993).

Camp has not shown good cause for failing to produce Dr. Hajj's report earlier.  Therefore, the Court need not address the question of the materiality of the new evidence. *Hinchey,* 29 F.3d at 433.  Camp has not met the required threshold, and Dr. Hajj's report was not considered by this Court.

## CONCLUSION

For the reasons discussed, the Court concludes that the Commissioner's decision is supported by substantial evidence on the record as a whole and is affirmed.

IT IS ORDERED that the decision of the Commissioner is affirmed, the appeal is denied, and judgment in favor of the Defendant will be entered in a separate document.

DATED this 3rd day of July, 2008.

BY THE COURT:

S/Laurie Smith Camp
United States District Judge

24